UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
CORE SWX, LLC,

                 Plaintiff,

       -against-

VITEC GROUP US HOLDINGS, INC and
VITEC PRODUCTION SOLUTIONS, INC.,

                 Defendants.
----------------------------------------------------------X
VITEC GROUP US HOLDINGS, INC and
VITEC PRODUCTION SOLUTIONS, INC.,

                 Plaintiffs,
CORE SWX, LLC,
                 Counterclaim Defendant,

       -against-

ROSS KANAREK, and RANDOLPH TODD,

                 Additional Counterclaim
                 Defendants.
----------------------------------------------------------X

**REPORT AND
<u>RECOMMENDATION</u>**

21-CV-1697 (JMA)(JMW)

**A P P E A R A N C E S:**

**Jessica Moore**
**Moish Eli Peltz**
**Paul Michael O'Brien**
**Andrew P. Cooper**
Falcon Rappaport & Berkman PLLC
265 Sunrise Highway
Suite 50
Rockville Centre, NY 11570
*For Plaintiff/Counter Defendants*

1

**Alvin C Lin**
**Fred H. Perkins**
**Katherine Lynn Burkhart**
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022
*For Defendants/Counter Claimants*

**WICKS,** Magistrate Judge:

## I.     PRELIMINARY STATEMENT

This case entails finger-pointing amongst competitors in the marketplace for batteries and charging solutions for broadcast, digital cinema, and professional video industries after a potential business deal fell through.  Plaintiff/Counter Defendant, Core SWX LLC ("Core"), commenced this action against Defendants/Counter Claimants, Vitec Group, PLC ("Vitec"), Vitec Group US Holdings, Inc. ("VGUSH"), and Vitec Production Solutions, Inc. ("VPS"), alleging trademark infringement, trademark dress infringement, breach of contract, unfair competition, tortious interference, and unjust enrichment.  (DE 34.)  Defendants asserted counterclaims against Core for theft of trade secrets, misappropriation, and unjust enrichment. (DE 35.)  Defendants also asserted claims against additional Counterclaim Defendants Ross Kanarek and Randolph Todd (members of Core) for breach of contract.  (*Id.*)

Before the Court on referral from the Honorable Joan M. Azrack is Core's, Kanarek's, and Todd's motion to dismiss Defendants' counterclaims.  (DE 45.) The parties appeared for oral argument before the undersigned on February 24, 2022.  (DE 54; DE 55.)  For the reasons that follow, the undersigned respectfully recommends that the motion to dismiss the counterclaims be GRANTED in part and DENIED in part.

## II.    <u>FACTUAL BACKGROUND</u>[1]

Core is the market leader for batteries and charging solutions for the broadcast, digital cinema, and professional video industries, and the emerging drone and virtual reality markets. (DE 34 at ¶24.)   Core developed a reputation for producing, manufacturing, and selling batteries of superior quality .  (*Id.* at ¶26.).  Counterclaim Defendants Kanarek and Todd own Core.  (*Id.* at ¶8.)  Kanarek is also the President and CEO of Core.  (*Id.* at ¶9.)

Vitec is a leading global provider of premium branded hardware products and software solutions to the "image capture and content creation" market.  (*Id.* at ¶33.)  Vitec and VPS design, manufacture, and distribute products, including batteries, and specifically market a line of batteries for the video production, photograph, videography and digital camera industries.  (*Id.* at ¶34.)  Vitec's batteries are marketed under the brand, "Anton/Bauer."  (*Id.* at ¶36.)  Anton/Bauer is a market leader for batteries designed for use in the production of motion pictures.  (DE 35 at ¶14.)

In early 2018, the parties discussed Defendants' interest in acquiring Core.  (DE 34 at ¶¶40-41.)  On May 22, 2018, the parties entered into a Mutual Confidentiality Agreement whereby VGUSH was provided access to significant amounts of Core's proprietary information, including "information regarding [Core's] plans, development and research projects, products, manufacturing methodology, the identity of vendors, use in competition, consultants and employees and its marketing, business, and strategic plans."  (*Id.* at ¶¶41, 47.)  Throughout 2018

---

[1] The facts are drawn from Core's Amended Complaint ("Complaint") (DE 34), and Defendants' Answer to the Amended Complaint with Counterclaims (DE 35), which are presumed to be true for purposes of this Report and Recommendation. In deciding a motion to dismiss, the Court may consider any document attached to the complaint. *Yanes v. Ocwen Loan Servicing, LLC*, No. 13-CV-2343 (JS)(ARL), 2015 WL 631962 at *2 (E.D.N.Y. Feb. 12, 2015).

and into the first half of 2019, Core shared its proprietary information, including business strategy, sales projections, intellectual property, product sources and related financial information to VPS and VGUSH.  (*Id.* at ¶¶52-62, 85-89.)   On October 7, 2018, Core and Vitec entered into a Letter of Intent pursuant to which VGUSH or one of its affiliates would acquire Core.  (*Id.* at ¶82.)

On April 28, 2019, Kanarek and Todd signed a Confidential Letter of Intent (separate from the Mutual Confidentiality Agreement executed between Core and VPS on May 22, 2018), as "Sellers."  (DE 35 at ¶51.)  The letter states, "The Sellers and Vitec [VGUSH] agree that this agreement, its existence, all information contain [sic] herein and the transactions contemplated by this agreement will remain confidential and shall not be disclosed to any party without prior written consent of the parties.  The Non-Disclosure Agreement dated 22 May 2018 remains binding on both parties."  (*Id.* at ¶52.)  On July 23, 2019, VGUSH sent an email terminating the LOI.  (DE 34 at ¶99.)

In the meantime, during 2019, Anton/Bauer developed plans for the "Micro" battery – a new, small battery product for the Independent Content Creator market.  (DE 35 at ¶10.)  Planning for the Micro battery included detailed product plans and strategic marketing strategies that were not shared outside of the company.  (*Id.* at ¶11.)  The plans and strategies were maintained in a secure electronic system that was only accessible to the employees who helped develop the information and/or needed the information to assist with product development or marketing.  (*Id.* at ¶12.)

Anton/Bauer also produces the Cine VCLX battery – a portable, high-powered battery for cine and high-voltage lighting applications.  (*Id.* at ¶14.)  The Cine involved years of product development and investment, for which the detailed product plans and marketing strategies were

also stored and maintained in the secure electronic system, and similar to the Micro, only employees who helped develop the information and/or had a need for the information to assist with its development or marketing had access to the system. (*Id.* at ¶17.)

An individual named Joseph Teodosio worked for VPS in several positions over the course of almost 30 years, including his final position as Manager/Training and Product Specialist for the Anton/Bauer brand. (*Id.* at ¶¶9, 20.) In these positions he was privy to what VPS refers to as proprietary trade secret, confidential, sensitive business information including product strategy, and financial and operational information of substantial commercial value. (*Id.*) Teodosio was particularly involved with the Micro battery's development and marketing, and intimately familiar with the marketing of the Cine VCLX, including all financial aspects of the marketing investments. (*Id.* at ¶¶18-19.) In mid-2019, Core allegedly began conversations with Teodosio, and had several meetings, to obtain access to proprietary information. (*Id.* at ¶21.) After 30 years with Anton/Bauer, Teodosio left and became the Chief Technical Officer of Core. (*Id.* at ¶22.) Defendants claim Teodosio took Anton/Bauer's proprietary and confidential information, including detailed product plans and marketing strategy documents and information regarding the Micro and VCLX products. (*Id.* at ¶26.) Defendants contend that Teodosio proceeded to share this information with Core, and in late spring of 2020, Core re-instituted a previously discontinued micro battery and positioned it in the marketplace to compete directly with Anton/Bauer's Micro product. (*Id.* at ¶¶23-24, 28, 31.) Further, in the late fall of 2020, Core allegedly started to show studios and large retailers a "Cine" battery that was materially identical in form, function, and operation to the Cine VCLX of Anton/Bauer's VCLX product. (*Id.* at ¶32.) Defendants assert that Core's misappropriation of Anton/Bauer's trade secret information regarding the Micro and Cine VCLX products caused damages to Anton/Bauer and

VPS through diverted sales.  (*Id.* at ¶34.)

## III.    RELEVANT PROCEDURAL HISTORY

Core commenced this action on March 29, 2021 (DE 1) and subsequently filed an

Amended Complaint on August 18, 2021, against Defendants Vitec, VGUSH, and VPS for

violations of the Lanham Act, trademark infringement, trademark dress infringement, unfair

competition, tortious interference, breach of a confidentiality agreement, and unjust enrichment.

(DE 34.)  Defendants answered and filed counterclaims against Core for theft of trade secrets,

common law misappropriation, unjust enrichment, and also filed counterclaims against Ross

Kanarek and Randolph Todd for breach of contract.[2]  (DE 16; DE 35.)  The parties subsequently

executed a stipulation of dismissal as to Vitec.  (DE 40; DE 41.)

On September 13, 2021, Core, Kanarek, and Todd filed a letter motion requesting a pre-

motion conference for an anticipated motion to dismiss the counterclaims.  (DE 37.)  Defendants

responded (DE 39), and the Honorable Joan M. Azrack referred the request to the undersigned,

and referred any resulting motion to the undersigned to issue a Report & Recommendation.

(Electronic Order dated Oct. 13, 2021.)  A pre-motion conference was held on November 8,

2021, at which a briefing schedule was entered.  (DE 43.)  On January 7, 2022, the parties filed

the fully briefed motion to dismiss the counterclaims.  (DE 45; DE 46; DE 47; DE 48; DE 50.)

Oral argument on the motion was held on February 24, 2022, and the Court reserved its decision

for the present Report and Recommendation.  (DE 54.)

## IV.    LEGAL STANDARD UNDER RULE 12(b)(6)

When considering a motion to dismiss, the Court must assume all well-pleaded facts to be

true, "drawing all reasonable inferences in favor of the plaintiff."  *Koch v. Christie's Int'l PLC*,

---

[2] Counterclaim Defendants Kanarek and Todd were also served Summonses, as they were not named
parties in the main action.  (*See* DE 17; DE 18.)

699 F.3d 141, 145 (2d Cir. 2012).[3]  However, this standard does not apply to legal conclusions or "threadbare recitals of a cause of action's elements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).   The Court uses a two-pronged approach to analyze the sufficiency of the pleadings in which district courts are to first "identify[ ] allegations that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 664.  "Though legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted)).  "[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal* at 678 (citing *Twombly* at 555).

Core, Kanarek, and Todd move to dismiss the counterclaims of Defendants VGUSH and VPS:  specifically, the counterclaim against Core for misappropriation of trade secrets pursuant to the Defend Trade Secrets Act, the counterclaim against Core for common law misappropriation of trade secrets, the counterclaim against Core for unjust enrichment, and the counterclaim against Kanarek and Todd for breach of contract.  (DE 45.)

---

[3] The standard applied is the same, whether the Rule 12(b)(6) motion is brought to dismiss a claim in a complaint or a counterclaim.  *See Officemax Inc. v. Cinotti*., 966 F. Supp. 2d 74, 78 (E.D.N.Y. 2013); *see also Seduka, LLC v. Street Moda, LLC*, No. 14-CV-0271 (DAB), 2015 WL 1089575, at * 2 (S.D.N.Y. Mar. 11, 2015) (noting that Rule 12(b) applies equally to claims and counterclaims and therefore, the same standard is applied when evaluating a motion to dismiss).

## V.    <u>DISCUSSION</u>

### A. <u>Federal and New York Trade Secret Law</u>

The Defend Trade Secrets Act ("DTSA"), codified in 18 U.S.C. § 1831, *et seq*., "created a federal cause of action for the misappropriation of trade secrets used in interstate commerce*." Elsevier Inc. v. Doctor Evidence, LLC*, 17-cv-5540 (KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018) (citations omitted.)  To establish a claim under the DTSA, a plaintiff must demonstrate (1) the existence of a trade secret, (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]" and (3) misappropriation of the trade secret.  *See* 18 U.S.C. §§ 1839(3), (5); 1836(b)(1).  Similarly, under New York law, a cause of action for misappropriation of trade secrets consists of (1) possession of a trade secret and, (2) use of that trade secret by the defendant "in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *Tri-Star Light. Corp. v. Goldstein*, 151 A.D.3d 1102, 1106, 58 N.Y.S.3d 448 (2d Dept. 2017) (internal quotation marks and citation omitted).

Here, Core argues that Defendants' counterclaims for misappropriation of trade secrets under the DTSA and state law fail because Defendants failed to plead that a trade secret existed, and further argue that Defendants did not sufficiently plead the act of misappropriation.  (DE 46.)  Defendants oppose, arguing that they have sufficiently pled a trade secret existed by identifying the categories of trade secrets and describing how they employed reasonable measures to maintain the secrecy of the trade secret information, and that they sufficiently plead conduct constituting misappropriation of the trade secret information.  (DE 47.)

First the Court addresses whether Defendants' counterclaims sufficiently plead the existence of a trade secret, and if so, whether the counterclaims sufficiently plead that the

purported trade secret was misappropriated.

### i. Whether Defendants Sufficiently Pleaded Existence of a Trade Secret

"The DTSA defines 'trade secret[s]' to include 'all forms and types of ... business ... information' if (1) 'the owner thereof has taken reasonable measures to keep such information secret' and (2) 'the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *TRB Acquisitions LLC v. Yedid*, No. 20-CV-0552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021) (citing 18 U.S.C. § 1833(3)). There is "no one-size-fits all definition to a trade secret [under the DTSA and New York trade secret misappropriation law] . . . ," but the following factors guide courts in analyzing its contours:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Univ. Processing LLC v. Weile Zhuang*, No. 17 CV 10210-LTS, 2018 WL 4684115, at *3 (S.D.N.Y. Sep. 28, 2018); *see also Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020); *Uni-Sys., LLC, v. U.S. Tennis Assoc., Inc.*, 350 F. Supp. 3d 143, 172 (E.D.N.Y. 2018) (citations omitted) (same). A party is not required to allege all factors in order to establish that information is a trade secret. *Amimon Inc. v. Shenzhen Hollyland Tech Co. Ltd.*, No. 20 Civ. 9170 (ER), 2021 WL 5605258, at *10 (S.D.N.Y. Nov.30, 2021) (citing *Iacovacci*, at 380) (noting that the factors are guideposts rather than elements). "[T]here is no heightened pleading standard for claims brought under the DTSA." *Mtivity, Inc. v. Office Depot, Inc.*, 525 F. Supp. 3d

433, 446 (E.D.N.Y. 2021) (collecting cases).

**Did Defendants plead sufficient detail to put Core on notice of what the alleged trade secret information is?**

Core argues that Defendants' allegation that Core misappropriated "Anton/Bauer's proprietary and confidential information, including detailed product plans and marketing strategy documents and information concerning the Micro and VCLS products," is too vague to put Core on notice of the nature of any trade secret it allegedly misappropriated. (DE 46 at 5.)  Defendants argue that alleging just particular categories of trade secrets is sufficient for pleadings purposes because their counterclaims mention specific products (i.e., the micro battery and "Cine" battery).  (DE 47 at 7-9.)

While there is no heightened pleading standard under the DTSA, "district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Zabit v. Branometry, LLC*, 540 F. Supp. 3d 412, 422 (S.D.N.Y. 2021) (internal quotation marks and citations omitted); *see also Lawrence v. NYC Med. Practice, P.C.*, 1:18-cv-8649-GHW, 2019 WL 4194576, at *4 (S.D.N.Y. Sep. 3, 2019) (collecting cases).

Although there does not appear to be a bright-line test to determine whether a DTSA claim has been plead with sufficient particularity, guidance can be gleaned from the various district court decisions within this Circuit. Alleging general categories of information and data as trade secrets is not enough to put a defendant on notice of the contours of the misappropriation claims. *TRB Acquisitions*, 2021 WL 293122, at *2 (citation omitted).  A party alleging misappropriation under the DTSA "has no obligation to reveal [its] secrets in the [c]omplaint simply to prove that they exist . . . But that does not mean a party can get away with nebulous descriptions at the highest level of generality." *Id.* (alterations in original) (internal quotation

10

marks and citations omitted).    "[G]eneral and vague references to methods, processes, interpretation, programs, and data configuration protocols do not plausibly support the existence of a trade secret without supportive facts explaining, for example, how such strategies, techniques or models function, how [the party] derives value from them, or what [the party] specifically does to ensure their secrecy." *Intrepid Fin. Partners, LLC v. Fernandez*, No. 20 CV 9779-LTS, 2020 WL 7774478, at *4 (S.D.N.Y. Dec. 30, 2020) (alterations added) (citing *Elsevier Inc.*, 2018 WL 557906, at *6 (holding that "[a]lleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue . . . does not give rise to a plausible allegation of a trade secret's existence.")). Trade secrets are not one and the same as confidential information. *Elsevier Inc.*, 2018 WL 557906, at *5. "However, the plaintiff is not required to specify the precise trade secrets to defeat a motion to dismiss." *Uni-Sys., LLC v. U.S. Tennis Assoc., Inc.*, 350 F. Supp. 3d at 171 (citation omitted).

On one side of the coin, there are decisions in this Circuit that persistently require a party to plead more than mere categorical designations of information.  For example, in *TRB Acquisitions LLC*, the Court held that:

> core brand and marketing strategy . . . includ[ing] plans to create and discontinue licensed product lines, and strategies and plans for competing in certain trade channels, product categories and markets, including which types of consumers to target, which retail and other channels to enter and at which price points, and ultimately which licensees to partner with

described "nothing more than general categories of information and data."  2021 WL 293122, at *2.  The Court there pointed out that Plaintiff did not offer particulars as to how its strategies and plans function or another basis for discerning exactly what information was allegedly misappropriated.  *See Elsevier Inc.*, 2018 WL 557906, at *5 (alleged trade secrets including

growth initiative, clinical methods related to executing projects, data configuration protocols and methods, data interpretation, process to assess the quality of evidence and how to execute it, assessments of the risk of bias of the evidence based on funding source, analytics, analytics tools/programming, unique and proprietary process for binding collecting original terms in publication and then binding like terms/synonyms to that original term, and embedded database field names, parameters and scheme information, were general categories of confidential information); *Lawrence*, 2019 WL 4194576, at *4-5 (alleged trade secrets including patient coordination, signing up patients, methods for advertising and communicating with prospective patients, and stealing patient lists, were described at the "highest level of abstraction" and not adequate to plead existence of a trade secret).

The flip side of that coin is that "courts [in this Circuit] have 'accepted relatively general descriptions of alleged secrets at the motion to dismiss stage[,]'" *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19-CV-7367 (JPO), 2020 WL 4570047, at *2 (S.D.N.Y. Aug. 7, 2020) (quoting *Island Intell. Prop., LLC v. StoneCastle Asset Mgmt. LLC*, 463 F. Supp. 3d 490, 500 (S.D.N.Y. 2020)). In *Ad Lightning Inc.*, the Court found that Ad Lightning's allegations included just enough specificity to put the defendant on notice of the claim – the complaint alleged that the proprietary information "combines synthetic audiences with live log-level user data to watch its clients' ad inventories around the clock, looking for bad ads, suspicious behavior, and compliance violations[,]" and "includes a reporting function that allows its publisher clients to send reports of bad ads directly to the suppliers who sent them, thereby enabling the suppliers to remove the bad ads moving forward." *See id.* (citing among others *Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-cv-5966 (JSR), 2017 WL 6507110, at *9 (S.D.N.Y. Dec. 18, 2017) ("technical data, internal pricing information, work product, research, [and] engineering designs" held sufficiently

specific); *Sorias v. Nat'l Cellular USA, Inc.*, 124 F. Supp. 3d 244, 259 (2015) ("data and designs of a specific phone charger with horizontally folding A/C prongs" sufficiently identified trade secrets at issue); *see also Iacovacci*, 437 F. Supp. 3d 367, 380-81 ("(1) non-public sourcing information for over 2,000 clients; (2) business-specific non-disclosure agreements; and (3) certain specifically identified documents, such as . . . Defendant's Direct Lending Presentation, Valuation Methodology, Principles and Procedures, Deal Scoring Template, and Underwriting and Closing Guidelines constituted trade secrets"); *Amimon Inc.*, 2021 WL 5605258, at *10 (finding that plaintiff sufficiently pled the alleged trade secret, "Source Code for its zero-latency transmission software," because such description was "far more specific than a 'general category[y] of confidential information'" (quoting *Elsevier*, 2018 WL 557906, at *6).

The Second Circuit has not addressed this issue head on. However, the Third Circuit recently addressed the level of specificity required for adequately pleading a trade secret under the DTSA. In *Oakwood Labys. LLC v. Thanoo*, 999 F.3d 892 (3d Cir. 2021), the Court noted that the DTSA was "substantially similar as a whole" to the state law trade secret statute, which in turn informed the Court's interpretation of the DTSA. *Id.* at 905 n.11. Under California state law, a trade secret "must be described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.* at 906. (internal quotation marks and citations omitted). Grappling with the same issue District Courts here have acknowledged – that resolving these disputes are difficult because of the "competing policies protecting plaintiffs and defendants in trade secret misappropriation cases[,]" – the Court found it was clear the Third Amended Complaint sufficiently pled the trade secrets at issue: information laying out "design, research and development, test methods and

results, manufacturing processes, quality assurance, marketing strategies, and regulatory compliance related to its development of a microsphere system for drug delivery, including peptide-based drugs." *Id.* at 907.  Moreover, the pleading also described "variables that affect the development of its microsphere products, including the data, peptide-specific release profiles, and other discoveries associates with those variables . . . [and] a particular document . . ." disclosed under a confidentiality agreement.  *Id.*

The Court's reasoning in *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412 (S.D.N.Y 2021) appears on par with the Third Circuit's logic, with District Judge Cronan aptly pointing out what distinguishes a pleading as being more than a broad or general category of information. Noting that although the plaintiff's claims echoed the overly broad categories found in *Elsevier* and *Lawrence*, the plaintiff's "broad categories of information [were tied] to the specific algorithm(s) underlying the BTW50 Index," and therefore could raise a claim.  *Id.* at 423.  The Court's analysis in *ExpertConnect, LLC v. Fowler*,  No. 18 Civ. 4828 (LGS), 2019 WL 3004161 (S.D.N.Y. July 10, 2019) also provides sound guidance. There the Court found that the alleged categories (client lists and client preferences, contract details, expert lists and performance criteria) were sufficiently specific, highlighting the fact that the complaint identified specific documents alleged to be trade secrets, such as a PowerPoint, two client contracts, and a renewal proposal. *Id.* at 9.

Here, Defendants' argument – that the particular secret information at issue is the proprietary product designs and marketing development information for two specific products, the "micro" battery and the Cine VCLX battery being developed in 2019 – does not quite clear this hurdle.  Tying the general categories of information to the two types of batteries does not put Core on notice as to the nature of the purported trade secret – it merely ties two general

14

categories to two products as opposed to a specific algorithm, specific portion of the product, or specific document. *Compare to Ad Lightning Inc., supra* (describing how proprietary information functions and type of data involved); *Iacovacci*, *supra* (pointing out that pleading referred to certain specifically identified documents); *Sorias*, *supra* (data and designs were tied to a specific phone charger described as horizontally folding A/C prongs).[4]  Thus, even *Amimon Inc.*, *supra*, is distinguishable from the facts here, albeit perhaps minimally, as "*Source Code* for [the] zero-latency transmission *software*" is more specific than "*product design*" or "*marketing information*" related to an *entire battery product*. (Emphasis added.)  No specific document within the product design information or marketing information is mentioned, nor were these general categories tied to a specific aspect of either battery product.  Here, the Court finds that Defendants have not come close to crossing the fine line, so to speak, wherein they run the risk of revealing the trade secret itself within the pleading.  Hence the Court finds here that Defendants' counterclaims simply are not specific enough to put Core on notice of the purported trade secret information.

**Did Defendants take reasonable measures to keep the alleged trade secret information safe?**

As for whether Defendants took reasonable measure to keep their information safe, Core contends that Defendants have not alleged sufficient detail concerning the security measures employed by its "secure electronic system."  (DE 46 at 7.)  Defendants argue that their counterclaims are specific as they allege that the trade secret information was (i) not shared outside the company, (ii) securely stored and maintained in the secure electronic system, and (iii) restricted in access to those employees who developed the information or needed it to assist with

---

[4] The Court notes that the *Sorias* decision was issued prior to the enactment of the DTSA, but nonetheless finds the decision relevant as state and federal trade secret claims are analyzed under the same standard, as discussed herein.

the product development.  (DE 48 at 9-10 (citing DE 35 at ¶¶ 11, 12, 17).)

      "Reasonable measures" include "confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential . . . and frequently reminding employees of the need to maintain confidentiality." *Inv. Sci., LLC v. Oath Holdings Inc.*, No. 20 Civ. 8159 (GBD), 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021) (citation omitted).  "[C]ourts in this Circuit generally look to whether confidentiality or nondisclosure agreements are in place and whether the information is guarded by physical- or cyber-security protections." *Turret Labs USA, Inc. v. CargoSprint, LLC*, 19-CV-6793 (EK) (RML), 2021 WL 535217, at *4 (E.D.N.Y. Feb. 12, 2021) (citation omitted).  Generally, Courts have found that parties meet this standard by alleging that they took measures to keep the information confidential through confidentiality or non-disclosure agreements and protected actual access to the information.  *See Syntel Sterling Best Shores Mauritius Limited v. Trizetto Grp., Inc.*, 2016 WL 5338550, at *6 (S.D.N.Y. Sep. 23, 2016) (finding that pleadings sufficiently alleged party had taken reasonable measures to keep information "secret by making those who use it subject to confidentiality provisions and limitations, and only making it accessible through strictly controlled servers"); *Mtivity, Inc.*, 525 F. Supp. 3d 433, 446 (holding that confidentiality clause and "generic assertion that company 'closely guards' its proprietary software, establish that the software contains or is itself a 'trade secret'"); *Trahan v. Lazar*, 457 F. Supp 3d 323, 343 (S.D.N.Y. 2020) (finding that requiring restrictive covenants in employment contracts, using computer password protection and firewalls, limiting access to information, establishing restriction of unauthorized use, tracking improper re-distribution, and implementing a strictly enforced policy not to disclose "Models" to clients or anyone else, constituted reasonable measures were taken to keep information secret);

*Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-cv-6545 (KAM), 2021 WL 5630910, at *6 (E.D.N.Y. Dec. 1, 2021) ("[Plaintiff] has taken reasonable measures to keep this information secret through restrictions on access and the use of nondisclosure agreements." (citing *Syntel*, at *6)). A party alleging trade secret misappropriation "must show only sufficient secrecy, not absolute secrecy, meaning that except by use of improper means, there would be difficulty in acquiring the information." *Zabit*, 540 F. Supp. 3d 412, 427 (finding that where numerous other individuals had access to the purported trade secret and that the plaintiff licensed the information to defendant without confidentiality agreements, instructions to keep the information secret, or other protective security measures, the threshold for sufficient secrecy was not met).

Here, Defendants alleged that the information was securely stored and maintained in the secure electronic system – only accessible to employees who had helped develop the information or needed the information to assist in product development/marketing, and that Teodosio "understood" the proprietary and confidential nature of the information. (DE 35 at ¶¶ 12-13.) However, Defendants' counterclaims lack any specificity regarding why Teodosio would understand the information's proprietary and confidential nature, such as whether an employee handbook communicated the proprietary nature of the information, and/or whether Teodosio was informed/reminded of the information's confidential nature. Moreover, although there was a confidentiality agreement in place between the parties when they were discussing the potential acquisition deal, there are no allegations that Teodosio, as an employee, signed a confidentiality or non-disclosure agreement. Indeed, during oral argument it was conceded that Teodosio did not sign a confidentiality agreement of any sort. (DE 55 at 11.) Nor do the counterclaims provide any facts about the so-called "secure electronic system." Was the information encrypted? Was the system password protected? There are no details. The paucity of

information is telling and, as such, Defendants' counterclaims do not adequately plead that Defendants took sufficient measures to keep the alleged trade secrets confidential.  *See Lawrence*, 2019 WL 4194576, at *5 (finding that complaint offered "scant facts" about what "reasonable steps" party took to protect secrecy of its confidential information, even considering employees signed agreements that contained "trade secret protections," because such agreements alone do not suggest existence of a trade secret); *Zabit*, 540 F. Supp. 3d at 426 (finding that plaintiff's allegation that individuals knew about binding agreements "says little about any 'reasonable efforts' taken to maintain secrecy or efforts to keep the information secret" and that disclosing a trade secret to others who are under no obligation to protect the information extinguishes the property right) (citations omitted).

**The Other Factors Considered**

Consideration of the other factors used in evaluating the contours of a trade secret does not fare any better, nor does it help salvage the counterclaim.  In regard to the value of the information to the business and its competitors, Defendants plainly allege that "Anton/Bauer's information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information," and that they were damaged "through lost sales and confusion in the marketplace." (DE 35 ¶¶37, 39, 44.)  This is too vague.  *Cf. Zabit*, 540 F. Supp. 3d at 424 (finding plausible claim that "the information derives independent economic value, actual or potential[,]" where plaintiffs specifically alleged they can license the subject algorithm, and stated the value of the license at $540,000) (citing 18. U.S.C. § 1839(3)(B) (alteration added)); *Mtivity, Inc.*, 525 F. Supp.3d at 446 (complaint alleged that plaintiff spent over $18 million and 18 years of labor on research and development,

weighing the fourth and fifth factors in its favor).  *See also Intrepid Fin. Partners, LLC v. Fernandez*, No. 20 CV 9779-LTS, 2020 WL 7774478, at *4 (S.D.N.Y. Dec. 30, 2020) (finding that the amended complaint lacked sufficient facts to plausibly plead a DTSA claim "as opposed to the general proposition that there is a broad range of confidential information that is valuable to Intrepid, that all of its employees are obliged to keep confidential, and that would provide a commercial advantage to competitors").

As for setting forth the extent to which the information is known outside the business/known by employees and others involved in the business, and the ease or difficulty with which the information could be properly acquired or duplicated by others, Defendants merely assert what was discussed above: "All detailed product plans and marketing strategies were securely stored and maintained in the secure electronic system, and were only accessible to those employees who had helped develop the information and/or who had a need for the information in order to assist with product development or marketing."  (DE 35 ¶¶12, 17.)

Thus, applying the six factors as guideposts to assess the contours of the purported trade secret, the Court finds that Defendants' counterclaims do not plausibly state the existence of a trade secret.  Accordingly, the undersigned respectfully recommends that Defendants' trade secret misappropriation claims under New York and federal law be dismissed, with leave to replead.[5]

### i.    Misappropriation

If the Honorable Joan M. Azrack does not adopt the foregoing, and instead concludes that

---

[5] *See Ad Lightning Inc.*, 2020 WL 4570047, at *4 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.")); *see also Merrill Lynch Cap. Servs., Inc. v. UISA Fin.*, No. 09 Civ. 2324 (RJS), 2009 WL 10701974 (S.D.N.Y. Oct. 1, 2009) (granting leave to amend counterclaims that were inadequately pleaded as conclusory allegations).

the counterclaims adequately plead existence of a trade secret, for purposes of this Report and Recommendation, the Court now addresses whether Defendants sufficiently plead "misappropriation" of the alleged trade secret information.

"The requirements are similar for showing a misappropriation of a trade secret under the DTSA and misappropriation under New York common law." *ExpertConnect*, 2019 WL 3004161, at *7. To establish misappropriation "[u]nder the DTSA, 'a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" *Amimon Inc.*, 2021 WL 5605258, at *11 (citation omitted). Simply put, '[t]here are three ways to establish misappropriation under the DTSA: improper acquisition, disclosure, or use of a trade secret without consent." *Oakwood Laby's. LLC*, 999 F.3d at 908-09 (citing 18. U.S.C. § 1839(5)). "Improper means under the Act includes theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy, but excludes reverse engineering, independent derivation, or any other lawful means of acquisition." *Altman Stage Lighting, Inc. v. Smith*, 20 CV 2575 (NSR), 2022 WL 374590, at* 4 (S.D.N.Y. Feb. 8, 2022) (alteration in original) (quoting 18 U.S.C. § 1839(6)) (internal quotation marks and additional citation omitted).

Core argues that Defendants do not allege the specific information that Teodosio purportedly misappropriated, the method he used to retrieve the information, the date and time Teodosio communicated the information to Core, or when Defendants discovered that Teodosio had committed these acts. (DE 46 at 6.) Defendants counter, arguing that their counterclaims

plead sufficient detail by asserting that: Teodosio was formerly their long-time products manager (DE 35 at ¶¶ 9, 20); Teodosio acquired the information Defendants as the result of his access during employment (*Id.* at ¶¶ 13, 15, 17); Core secretly contacted and recruited Teodosio, unlawfully, for the purpose of obtaining the trade secret information unlawfully taken by Teodosio, and used the information without knowledge or consent of Defendants.[6]   (*Id.* at ¶¶ 21-22, 26-28.)

Circumstantial datapoints that may be enough to make an allegation possible, however, do not amount to pleading a plausible claim. *Ad Lightning, Inc.*, 2020 WL 4570047, at *3 (finding that besides alleging three former employees had access to all of the plaintiff's information through a certain program, the plaintiff failed to allege facts suggesting that the former employees actually acquired the information through improper means); *see also Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 674 (S.D.N.Y. 2016) (finding no plausible allegations that employee needed any inducement because complaint lacked factual detail that plaintiff was solicited secretly to work for him); *compare to Amimom,* 2021 WL 5605258, at *11 (misappropriation was properly pled where the plaintiff alleged that the compiled binary version of its Source Code could not be publicly modified; plaintiff alleged that it does not disclose, sell, or distribute the Source Code, and that after examining one of defendant's products, it learned that the product contained a compiled version of the Source Code that had been slightly

---

[6] While conceding at oral argument that Teodosio did not sign a confidentiality agreement, Defendants set forth a new argument – that Teodosio owed common-law duties of loyalty to the company.  (DE 55 at 11.)  However, to pursue that argument, Defendants should have pled this as a separate cause of action in their counterclaims.  *See Optionality Consult. PTE. LTD. v. Edge Tech. Grp. LLC*, 18-CV-5393 (ALC), 2021 WL 310942, at *9 (S.D.N.Y. Jan. 29, 2021) (citing *Poller v. VioScrip.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) ("A breach of fiduciary duty, and generally in tandem, of loyalty, occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets [or] misuse of confidential information")) (alterations in original) (internal quotation marks and citation omitted).

modified); *MasterCard Int'l. Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 604-05 (S.D.N.Y. 2016) (allegations sufficient to state a claim where complaint alleged that "[d]efendants [who had signed confidentiality agreements] reconfigured NIKE's network to resemble MasterCard's network using MasterCard's Confidential Information, which [defendants] were privy to in their previous positions . . . at Master Card . . . and [that defendants] disclosed information concerning . . . MasterCard's network configuration").[7]

Here, the counterclaims allege that in January of 2020, Teodosio resigned and became the Chief Technical Officer at Core, and that Teodosio took with him the proprietary and confidential detailed product plans and marketing strategy documents, which Core knew Teodosio did not have authorization to take or reveal – and that doing so was improper.  (DE 35 at ¶¶22, 26-27) Further, Defendants allege that when Teodosio joined Core, they did not have a competing "Micro" or Cine battery, and Core urged Teodosio to share the confidential information with Core.  (*Id.* at ¶¶23-25, 28.)  The counterclaims allege that in late-Spring of 2020, Core re-instituted a previously discontinued micro battery directly copying Anton/Bauer's product and in the fall of 2020, Core began showing retailers/studios a new "Cine" battery, identical to VPS's Cine.  (*Id.* at ¶¶31-32.)

The Court finds these allegations to be "circumstantial datapoints" as described in *Ad Lightning, Inc.*, *supra*, and that Defendants have not set forth sufficient facts to plausibly claim that the purported trade secret was acquired through improper means, or that the purported trade secret was disclosed/used without consent.  Again, there is nothing in the counterclaims regarding Teodosio signing a confidentiality agreement, let alone signing such an agreement then

---

[7] The Court also notes that the *Mastercard* decision was issued prior to the enactment of the DTSA, but nonetheless finds the decision relevant as state and federal trade secret claims are analyzed under the same standard, as discussed herein.

breaking that agreement, and therefore improperly disclosing information or disclosing it without consent.  Moreover, Defendants' vague assertions that their alleged trade secrets were only accessible to those employees who had helped develop the information and/or who had a need for the information in order to assist with product development or marketing, is entirely vague as to who actually had access, how many people had access, and how that information was accessed.  This is simply not enough to state a claim.  *See Trahan v. Lazar*, 457 F. Supp. 3d 323, 344 (S.D.N.Y. 2020) (finding that misappropriation by improper means is not adequately alleged when the subject information is willingly given, or where defendant acquired information in course of official duties while employed).  Moreover, the counterclaims do not set forth any facts regarding what actions Teodosio *actually took* to acquire the information and/or the means by which he did so.  *Cf. Smart Team Global, LLC v. HumbleTech LLC*, 19-cv-487 (AJN), 2020 WL 2836465, at *4 (S.D.N.Y. June 1, 2020) (finding that an amended complaint plausibly alleged misappropriation where it alleged that the defendants wrongfully acquired and used the subject source code to provide services to their clients, and specified the improper means that plaintiff believed defendants used in doing so); *Iacovacci*, 437 F. Supp. 3d at 381 (finding misappropriation adequately pled where allegation stated that employee stole information by forwarding several documents to his personal email and disseminating them, and also alleged that employee modified documents for his own use); *AUA Priv. Equity Partners, LLC v. Soto*, 1:17-cv-8035-GHW, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (finding misappropriation sufficiently pled where employee was alleged to have uploaded trade secrets from her work laptop to her personal cloud-based storage without permission and in violation of confidentiality agreements she signed).

Accordingly, the undersigned respectfully recommends that Defendants' trade secret

claims under New York law and the DTSA be dismissed for failure to sufficiently plead misappropriation again, with leave to replead.

## B. Breach of Contract[8]

The elements of breach of contract in New York are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Martino v. MarineMax Ne., LLC*, 17-CV-4708 (DRH)(AKT), 2018 WL 6199557, at *3 (E.D.N.Y. Nov. 28, 2018) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). In New York, "an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) (internal quotation marks and citation omitted). Courts analyze several factors to determine whether such clear and explicit evidence of intent exists, "including the length of the contract, the proximity of any liability provision to the signature line, the presence of the signatory's name in the agreement itself, the signatory's role in the corporation, and the nature of contract negotiations." *Lanzafame v. Dana Restoration, Inc.*, No. 09-CV-0873 (ENV)(JO), 2010 WL 6267657, at *4 (E.D.N.Y. Aug. 12, 2010), *report and recommendation adopted*, 2011 WL 1100111 (E.D.N.Y. Mar. 22, 2011) (citation omitted).

Defendants' counterclaim for breach of contract alleges that on May 22, 2018, Core and VPS signed a Mutual Confidentiality Agreement regarding the possible acquisition of Core by

---

[8] Although the breach of contract counterclaim is against Core, Kanarek, and Todd, Defendants acknowledge in footnote 2 of their opposition that they do "not assert a breach of contract claim against Core pursuant to the April 24, 2019 LOI . . ." (DE 47 at 15, n.2). Further, the breach of contract counterclaim pertaining to Core is limited to May 22, 2018 Mutual Confidentiality Agreement, and Core does not move to dismiss that breach of contract claim. (*Id.*)

VPS.  (DE 35 at ¶50.)  On April 28, 2019, Kanarek and Todd signed a Confidential Letter of Intent dated April 25, 2019 ("LOI"),[9] on behalf of themselves personally as "Sellers." (*Id.* at ¶51.)  The LOI contained language requiring the agreement, its existence, and all information therein, including the transactions contemplated by the agreement to remain confidential, and that the May 22, 2018 agreement remained binding.  (*Id.* At ¶ 52.)  Defendants allege that Core, Kanarek, and Todd breached the agreements by filing the instant lawsuit and attaching to the public filing copies of confidential communications between the parties, proprietary information of VPS, and details about the contemplated transaction/strategic considerations.  (*Id.* at ¶¶ 54, 58-60.)

Kanarek and Todd argue that the breach of contract claim should be dismissed against them because the April 25, 2019 LOI is not sufficient to hold them individually liable for an alleged breach of a confidentiality provision within the letter.  (DE 46 at 13-15).  Kanarek and Todd assert that Defendants must have understood that Kanarek and Todd were acting in their capacity as agents for Core rather than individually, since they are the only owners of Core, and thus, the only people with authority to approve the potential acquisition and that is why they signed the LOI.  (*Id.* at 14-15.)  Kanarek and Todd further argue that the breach of contract claim concerns an asset purchase agreement, and only the company (not individual shareholders) have the right or ability to sell the company's assets.  (*Id.* at 15.)  Thus, they argue that this precludes any indication that either, Kanarek or Todd, intended to create personal liability by signing the agreement as "Sellers."  (*Id.*)  Defendants counter, arguing that the term "Sellers" is defined as Kanarek and Todd, and that the counterclaims specifically allege that the LOI states that "The Sellers and Vitec [VGUSH] agree that this agreement . . ."  (DE 48 at 16.)

---

[9] The Letter of Intent is attached to the Amended Complaint as Exhibit FF, and for convenience of the Court Defendants attached a copy of the LOI to their opposition (DE 48, Ex. B).

Kanarek and Todd are essentially asking the Court to ignore the pleading and reinterpret the plain language of the LOI.  While Kanarek and Todd point out that typically an officer signs an agreement twice – once as an officer and again as an individual, *See EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 232 (S.D.N.Y. Mar. 20, 2012), this alone does not warrant dismissal.  At this stage, upon reviewing the LOI, the Court finds that Defendants have adequately pled a breach of contract claim against Kanarek and Todd.  Kanarek and Todd did not sign the letter "on behalf of" Core.  Rather, they signed the LOI "as Sellers," which the LOI defines to be Kanarek and Todd.[10]  Indeed, there is no mention of "Core" in the signature area at all.  (DE 34, Ex. FF.)  *See Lerner*, 938 F.2d at 5-6 (noting that the individual's signature followed the company name and the word "by," indicating that he signed as an agent of the corporation rather than on behalf of himself as an individual).  The LOI also shows that Todd actually added his printed name and signature to the document, as there was not originally a pre-printed space for him to sign.  (DE 34, Ex. FF.)  In comparison, the May 22, 2018 agreement was only signed by Kanarek with "Core" written above his signature (DE 34, Ex. A,) but the LOI was signed by both Kanarek and Todd, without any mention of Core in the signature section.  Moreover, the LOI is 10 pages, which is not necessarily "long enough to bury fine print attempting to trap [Kanarek and Todd] into being bound individually."  *See EQT Infrastructure Ltd.* 861 F. Supp. 2d at 233 (citing cases) (finding that three page LOI weighed in favor of finding that plaintiff adequately pled breach of contract claim against individual defendant).

Thus, the Court finds that Defendants plausibly state a claim for breach of contract by Kanarek and Todd individually.  *Compare to Novak v. Scarborough All. Corp.*, 481 F. Supp. 2d 289, 294 (S.D.N.Y. 2007) (dismissing breach of contract against individual defendant where

---

[10] The LOI is written directly to Mr. Kanarek and refers to "you and your father-in-law (the "Sellers").  At oral argument it was confirmed by Counsel that Mr. Kanarek's father-in-law is Mr. Todd.  (DE 55 at 20.)

complaint alleged "little more than that [individual] acted 'on behalf of [corporate defendants]'"); *Gorra Holding v. Nu-Tech Bio-Med, Inc.*, No. 98 CIV. 0764(HB), 1999 WL 4922, at *6 (S.D.N.Y. Jan. 5, 1999) (dismissing claim against individual defendant for breach of contract because no allegation that he assumed personal liability, acted in bad faith, or committed tort in connection with performance of contract).  Accordingly, the undersigned respectfully recommends that Kanarek and Todd's motion to dismiss the breach of contract claims be denied.[11]

### C.  Unjust Enrichment

"An unjust enrichment claim requires plausible allegations that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Pauwels v. Deloitte LLP*, No. 19-CV-2313 (RA), 2020 WL 818742, at *15 (S.D.N.Y. Feb. 19, 2020) (internal quotation marks and citation omitted).  "Generally, a claim for unjust enrichment may be pleaded in the alternative to other claims." *Elsevier*, 2018 WL 557906, at *2 (internal quotation marks and citation omitted).  However, unjust enrichment claims cannot merely duplicate or replace a contract or tort claim.  *Id.* (citation omitted).

Core argues that VPS's unjust enrichment claim should be dismissed because it is identical to its claims for misappropriation under DTSA and common law misappropriation. (DE 47 at 12-13.)  Defendants argue that the legal theory for the unjust enrichment claim is distinct from the misappropriation claim since there can be unjust enrichment even where there is no cognizable breach of contract or recognized tort.  (DE 48 at 13-14.)  However, Defendants

---

[11] Although not addressed by the parties, the undersigned recommends that if the foregoing recommendations herein are adopted, the Court continue to exercise jurisdiction over the breach of contract counterclaims, which are state law counterclaims, as there is still an independent basis for subject-matter jurisdiction by Core's claims in the Complaint. (*See* DE 34.)

conceded during oral argument that the claim was indeed pled in the alternative.  (DE 55 at 16-17.)  The claim should thus be dismissed.  *See ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at \*10 (holding that it was uncontested that plaintiff's unjust enrichment claim arose out of the same alleged misconduct as the breach of contract claim, and therefore dismissing the claim as duplicative). Accordingly, the undersigned respectfully recommends that Core's motion to dismiss the unjust enrichment claim be granted.

## VI.    **CONCLUSION**

Based on the foregoing, the undersigned respectfully recommends that: (1) Core's motion to dismiss Defendants' federal and state law claims for misappropriation of trade secrets be granted on the grounds that Defendants failed to plead the existence of a trade secret; (2) Core's motion to dismiss Defendants' federal and state law claims for misappropriation of trade secrets be granted on the grounds that Defendants failed to plead misappropriation; (3) Kanarek's and Todd's motion to dismiss Defendants' breach of contract claim be denied; and, (4) Core's motion to dismiss Defendants' unjust enrichment claim be granted.

The undersigned further recommends that such dismissal shall be without prejudice, and that Defendants be granted leave to amend their counterclaims.  *See Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 264 (S.D.N.Y. 2020) (finding that under Fed. R. Civ. P. 15(a)(2), leave to amend should be given freely "when justice so requires," including leave to amend *sua sponte* when the court dismisses most of a party's claims on the basis of an inadequate pleading).

## VII.    **OBJECTIONS**

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. §

636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision") (citation omitted); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:  Central Islip, New York
        July 14, 2022

Respectfully submitted,

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge